UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>ALAN SAMUEL SORTO-MUNOZ,<br>Defendant. | 4:21-CR-40155-KES<br><br>REPORT & RECOMMENDATION |

**INTRODUCTION**

Defendant, a person believed to be Alan Samuel Sorto-Munoz, is before the court on an indictment charging him with illegally re-entering the United States after having previously been deported, in violation of 8 U.S.C. § 1326(a). See Docket No. 1.  He filed a motion to dismiss, opposed by the government, which the district court referred to this magistrate judge for the holding of an evidentiary hearing and the recommending of a disposition.  See Docket Nos. 24, 34 & 37.

**FACTS**

The government obtained an indictment against the defendant and he made his initial appearance before this court approximately one month later. Docket Nos. 1 & 7.  Counsel was appointed for the defendant.  Docket No. 9. No preliminary hearing or other evidentiary hearing on the merits of the charge against the defendant have been held.  The case was initiated via indictment,

not complaint, so there is no affidavit accompanying the charging document giving any details about the defendant or his nationality.

The facts adduced at the evidentiary hearing in connection with defendant's motion to dismiss were voluminous and pertain to legislative history and intent. Rather than describing that testimony in detail in a separate section of this opinion, the court discusses the relevant testimony as it relates to the legal issues in the DISCUSSION section, below.

## DISCUSSION

### A.    Equal Protection Under the Fifth Amendment

The Fourteenth Amendment, applicable to the states, provides in pertinent part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Fifth Amendment, applicable to the federal government, contains no Equal Protection clause.[1] Nevertheless, at least since Chief Justice Warren's opinion in Bolling v. Sharpe, 347 U.S. 497, 499-500 (1954), a companion case to Brown v. Bd. of Educ., 347 U.S. 483

---

[1] The Fifth Amendment reads in its entirety as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Mililtia, when in actual service in time of War or public danger; nor shall any person be subject to the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V.

(1954), an Equal Protection guaranty has been implied in the Fifth Amendment arising out of that amendment's Due Process Clause.  Washington v. Davis, 426 U.S. 229, 239 (1976).  Equal Protection analysis is the same under both the Fifth and Fourteenth Amendments.  Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 201 (1995); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

Because the Fifth Amendment provides protections for "person[s]," its protections extend to all persons present in the United States, even noncitizens.[2]  Zadvydas v. Davis, 533 U.S. 678, 690 (2001) (noncitizens present in the United States are entitled to the protection of the Fifth Amendment).  This is true even for noncitizens who are here unlawfully.  Mathews v. Diaz, 426 U.S. 67, 77 (1976).

Laws that discriminate on the basis of race are subject to strict scrutiny.  Adarand Constructors, Inc., 515 U.S. at 220.  If a statute is facially neutral, it may still violate the Equal Protection Clause if it has a racially disparate impact and the government acted with a racially discriminatory purpose.  Vill. of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977).  Here, the statute defendant challenges—8 U.S.C. § 1326—is facially neutral.[3]

───────────────

[2] This opinion uses the term "noncitizen" as equivalent to the statutory term "alien." See 8 U.S.C. § 1101(a)(3); Nasrallah v. Barr, ___ U.S. ___, 140 S.Ct. 1683, 1689 n.2 (2020).  Use of the term 'alien' is preserved to properly represent the legislative history of the 1952 Act.

[3] Section 1326(a) provides as follows:

When a criminal defendant raises an Equal Protection challenge to a criminal statute, he must show that Congress acted with a "discriminatory purpose." United States v. Clary, 34 F.3d 709, 712 (8th Cir. 1994) (Equal Protection challenge to the United States Sentencing Guidelines' 100:1 sentencing ratio for crack cocaine). It is insufficient that there is a disparate impact on an identifiable racial group. Id. The defendant must show that Congress "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. (quoting Pers. Admin. of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).

---

**(a) In general**
Subject to subsection (b), any alien who—

> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

Shall be fined under Title 18, or imprisoned not more than 2 years, or both.

See 8 U.S.C. § 1326(a). Subsection (b) of § 1326 provides enhanced penalties for certain removed aliens who reenter illegally. See 8 U.S.C. § 1326(b). Subsection (d) of § 1326 allows for certain collateral attacks on prior orders of deportation in a prosecution under subsections (a) or (b). See 8 U.S.C. § 1326(d).

The district court directed this magistrate judge to apply the <u>Arlington Heights</u> test to Mr. Sorto-Munoz's motion.  <u>See</u> Docket No. 37 at pp. 4 & 8. Under the <u>Arlington Heights</u> test, the court evaluates the following to discern whether Congress acted with discriminatory intent:  (1) whether the "impact of the official action . . . 'bears more heavily on one race than another' ";  (2) "the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes"; (3) "the specific sequence of events leading up to the" enactment of the legislation; (4) whether the legislation was enacted pursuant to "departures from the normal procedural sequence" or whether there were substantive departures; and (5) the "legislative or administrative history" of the enactment.  <u>Arlington Heights</u>, 429 U.S. at 267-68.  Furthermore, the <u>Arlington Heights</u> Court indicated that the above list was not exhaustive, indicating that additional factors may also be relevant.  <u>Id.</u> at 268 (stating that its summary did not purport to be exhaustive).

If the defendant succeeds in showing disparate impact and that a discriminatory intent was a "substantial" or "motivating" factor, "the burden shifts to the [government] to demonstrate that the law would have been enacted" even absent unlawful discrimination.  <u>Hunter v. Underwood</u>, 471 U.S. 222, 228 (1985); <u>Arlington Heights</u>, 429 U.S. at 271 n.21 (citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)).

The starting point of any challenge to a duly enacted Congressional statute is the presumed good faith of the legislature.  <u>Abbott v. Perez</u>, ___ U.S.

___, 138 S. Ct. 2305, 2324 (2018).  That presumed good faith is not changed by a showing of past discrimination.  Id.

### 1.    Membership in a Protected Class—Race or National Origin

While not addressed by either party, to demonstrate an Equal Protection claim, the defendant must first "show that he himself is injured by the challenged" law.  Arlington Heights, 429 U.S. at 261.  That is, a defendant must first demonstrate that he is a member of a protected group:  in this case, Mr. Sorto-Munoz must show he is a member of a racial group or a national origin group disadvantaged by § 1326(a).  Feeney, 442 U.S. at 272 (citing Arlington Heights, 429 U.S. 252) (the Equal Protection Clause protects against race discrimination and an Equal Protection claim based on race can be premised on an ostensibly neutral law that has a disproportionately adverse effect on a racial minority); Washington v. Davis, 426 U.S. 229, 239 (1976) (stating, "[t]he central purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race.").  See also United States v. Calvillo-Diaz, No. 21 CR 445, 2022 WL 1607525, at *1 (N.D. Ill. 2022) (reciting that defendant is a Mexican citizen bringing an Equal Protection challenge to 8 U.S.C. § 1326(a)); United States v. Machic-Xiap, 552 F. Supp. 3d 1055, 1060 (D. Ore. 2021) (reciting that defendant is a Guatemalan national challenging 8 U.S.C. § 1326(a) under the Equal Protection Clause).

Parties generally are denied standing to assert the rights of third persons.  Arlington Heights, 429 U.S. at 263.  Mr. Sorto-Munoz's motion to

6

dismiss is premised on the disproportionate impact of § 1326(a) on persons who are Latinx.[4]  Therefore, Mr. Sorto-Munoz must show that he is Latinx or that he is from Mexico, South America or Central America.  He has introduced no evidence to this end.  He has not admitted any element of the crime charged in the indictment.  Furthermore, he did not submit to a pretrial interview in this case, so he has not confirmed his identity, race, or national origin.  See Docket No. 5, p. 1.

It is true Mr. Sorto-Munoz is charged with being an alien under 8 U.S.C. § 1326(a), but the indictment does not specify Mr. Sorto-Munoz's race or nationality.  See Docket No. 1.  And, in any event, the indictment is not proof of anything, it is simply the government's (and the grand jury's) allegations.  This case did not originate with the filing of a complaint, so there was no preliminary hearing at which the government would have had the opportunity to introduce evidence relating to Mr. Sorto-Munoz's nationality or race.

Mr. Sorto-Munoz has filed two briefs in support of his motion to dismiss. See Docket Nos. 24 & 38.  In neither of those briefs does he allege his nationality or profess to be a member of the Latinx class.  Id.  In short, the record before the court is bereft of any evidence that the defendant belongs to the protected group against which defendant argues Congress discriminated when it enacted § 1326.

---

[4] For purposes of this opinion, this court chooses to follow the parties' identification of individuals of Latin descent and will use "Latinx" throughout.

The court is unwilling to assume that Mr. Sorto-Munoz is a member of a racial minority or national origin group based on his name.  There are any number of names that can be extremely misleading as to one's race or national origin.  In addition, it is not even known if the defendant who is before the court is indeed Alan Samuel Sorto-Munoz.  One of the elements the government must prove beyond a reasonable doubt at trial is the defendant's identity—i.e., that the defendant found in the United States and who is before the court is the same person who was previously deported.  See 8 U.S.C. § 1326(a); United States v. Alvarez-Ulloa, 784 F.3d 558, 570-71 (9th Cir. 2015); United States v. DeLeon, 444 F.3d 41, 53-54 (1st Cir. 2006).

The court is not requiring the defendant to make an admission against his own interests in violation of the Fifth Amendment.  But he is required to assert that he belongs to a protected racial or national origin classification.  He could assert his race or national origin without admitting his identity or his immigration status.  He has failed to indicate he is Latinx, or that he hails from Latin America.  If this issue had been addressed by the parties, this magistrate judge would recommend denying Mr. Sorto-Munoz's motion to dismiss on this basis.  In the event this factor is satisfied by defendant at some later point in this litigation, the court addresses the remaining analysis.

### 2.    Arlington Heights Factors

#### a.    Disparate Impact

The Arlington Heights Court did not hold that disparate impact, standing alone, was sufficient to render a statute unconstitutional.  Arlington Heights,

429 U.S. at 266.  Rather, it stated courts should look at whether there was a disparate impact "unexplainable on grounds other than race."  Here, Mr. Sorto-Munoz has argued, and the district court found, that prosecutions under § 1326(a) fall disproportionately on Latinx persons.  See Docket No. 37 at p. 14. The court accepts that fact.  But Mr. Sorto-Munoz does not address whether that disparate impact is "explainable on grounds other than" discriminatory animus toward Latinx persons.

There is a long land border between Mexico and the United States that is certainly a primary reason behind the outsize impact of § 1326 on Latinx persons—there are simply more persons from Latin America who enter the United States by way of Mexico illegally after having previously been deported. But, as defendant points out, America shares a similarly long land border with Canada and Canadians are not a substantial number of those who are prosecuted under § 1326 each year.

True.  But there are economic reasons for this discrepancy in § 1326 prosecutions as between Canadians and Latinx persons, reasons that have nothing to do with discrimination, intentional or otherwise.  Real gross domestic product (GDP) per capita measures the average level of national income (adjusted for inflation) per person and thus gives a rough indication of average living standards.[5]  In 2021 Mexico[6] had a real GDP per capita of

---

[5] Economics Help, https://www.economicshelp.org/blog/glossary/real-gdp-capita/ (last visited Jan. 6, 2023).

[6] Mr. Sorto-Munoz has not identified his nationality, as discussed previously. The court therefore uses Mexico as one example of a Central American country

$9,926.40 in U.S. dollars.[7]  Canada's real GDP per capita for the same year was $52,051.40.[8]  The real GDP per capita for the United States was $69,287.50.[9]  Thus, there is a substantial economic incentive for residents of Mexico to want to immigrate to the United States, legally or illegally.  The same economic imperative is not present to the same degree for Canadians.

There must be a significant incentive for one to leave one's country, one's culture, one's home, one's family and neighbors to illegally re-enter the United States after having previously been deported, and risk criminal prosecution. The average incomes of Americans and Canadians are not substantially

---

comprised of Latinx citizens.  The real GDP per capita for other such countries is equally revealing. As of 2021 reporting: Guatemala's GDP is $5,025.60; El Salvador is $4,408.50; Nicaragua is $2,090.80; Costa Rica is $12,508.60; and Honduras is $2,831.00.  See The World Bank, *GDP per capita*, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD (last visited Dec. 2, 2022).

[7] See The World Bank, *GDP per capita*, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=MX (last visited Dec. 2, 2022).

[8] See The World Bank, *GDP per capita*, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=CA (last visited Dec. 2, 2022).

[9] See The World Bank, *GDP per capita*, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=US (last visited Dec. 2, 2022).  This court takes judicial notice of these real GDP per capital figures pursuant to FED. R. EVID. 201.  The facts so noticed are not subject to reasonable dispute and they can be accurately and readily determined from sources whose accuracy cannot be reasonable questioned. FED. R. EVID. 201(b).  The court may take judicial notice on its own at any stage of the proceedings.  Id. at (c)(1) and (d).  Either party, should they wish to dispute the real GDP per capita numbers recited herein, may be heard by filing a motion indicating their desire to present argument or evidence contradicting the real GDP per capita figures.  Id. at (e).

10

disparate and the two countries have similarly stable governments.  The difference between the standard of living of Canadians and that of Americans is simply not a big enough difference to incentivize Canadians to take that leap and enter the United States illegally.  In addition, the higher standard of living in Canada makes it more feasible for Canadian citizens to pay the required fees and follow the legal procedure to enter the United States.[10]

But the difference between the standard of living of Mexico and other Latin American countries as compared to the United States *is* a significant difference.[11]  The difference between the real GDP of a Mexican citizen and that of an American citizen is $60,000 per year.[12]  For many citizens of Latin America, that economic difference is sufficient to offset the sacrifice and the risk of entering the United States illegally in a way that is not true for Canadians.  The economics of illegal entry in the United States was the same in 1952 as it is now.[13]

---

[10] There are fees for visas to enter the United States which range in price from $160 to $4,500.  See U.S. Department of State – Bureau of Consular Affairs, *Fees for Visa Services*, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/fees/fees-visa-services.html (last visited Dec. 2, 2022).

[11] See *supra* note 3 for economic information about real GDP numbers for countries in Central America other than Mexico.

[12] For a Nicaraguan or Honduran citizen, the difference in real GDP is $67,000 per year.  For a Guatemalan citizen the difference in real GDP is $63,000 per year.  See *supra* note 3.

[13] Docket No. 54-2 at pp. 236-37 (testimony of Commissioner of Immigration and Naturalization, A.R. Mackey, before the Senate Appropriations Committee in 1952) (noting that Mexicans were coming to America illegally because the rate of exchange with Mexico was 8.65 pesos for $1 American).

Thus, the greater numbers of Latinx persons who are prosecuted under § 1326 can be seen as a function of the fact that greater numbers of Latinx persons come to the United States illegally.  For countries other than Canada and Mexico (which share a land border with the United States), the difficulty of crossing the ocean to reach America's shores makes it unlikely that any other nation's citizens will enter the United States illegally in significant numbers after having previously been deported and thus be subject to § 1326.

Another reason that § 1326 impacts Latinx persons disproportionately is that, until 1965, Western Hemisphere nations were never subject to immigration restrictions or quotas.  That changed in 1965 when Congress again passed an omnibus immigration law that did away with the old racial quotas and imposed an annual quota of 20,000 immigrants on each country. See Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965). This new limitation on Latin America was far less than the number of Latin American persons who had immigrated to the United States immediately prior to the passage of the 1965 Act.

For example, some 235,000 persons immigrated annually from Mexico alone in the early 1960s. [14]  After passage of the 1965 Act, the number of deportations of Mexican citizens from the United States rose 40 percent.[15]  The

_____

[14] Mae M. Ngai, Impossible Subjects: Illegal Aliens and the Making of Modern America, at 261 (2004).  Both of defendant's experts cited to the entirety of Ms. Ngai's book.  Docket No. 38-1 (Kang Affidavit at p. 3, note 8); Docket No. 24-15 (Gonzalez O'Brien Declaration at p. 13, note 14).

[15] Id.

quotas were held in abeyance as to Mexico until 1976, at which time deportations skyrocketed 417 percent.[16]  The quotas did not similarly affect Canada because, before imposition of the quotas, there were not large numbers of Canadians who entered or reentered the United States illegally.  The new quota imposed on Canada did not restrict a large stream of persons who were immigrating to America prior to imposition of the quota.

Finally, the numbers of legal and illegal immigrations from Latin America increased in the 1980s and 1990s as Latinx people fled war-torn countries in Central America.[17]  Nicaragua experienced a revolution from 1961 to 1990.  El Salvador experienced a civil war from 1979 to 1992.  From 1982 to 1986, death squads kidnapped, tortured, and disappeared an unknown number of Honduran citizens.[18]  Canada did not experience similar displacements and upheavals during the period from 1952 to the present.

The court finds § 1326 has a disparate impact on Latinx persons.  However, that disparate impact is explainable on grounds other than race or national origin discrimination.  It is questionable whether disparate impact for which obvious explanations other than race exist requires the court to continue

_____

[16] 151,000 Mexicans were deported in 1968.  781,000 were deported in 1976. Id.

[17] Id. at 265.

[18] See Susan Gzesh, Central Americans and Asylum Policy in the Regan Era, Migration Policy Institute (Apr. 1, 2006), https://www.migrationpolicy.org/article/central-americans-and-asylum-policy-reagan-era/.

13

further analysis of discriminatory intent.  See United States v. Wence, 3:20-CR-0027, 2021 WL 2463567, at *10 (D.V.I. June 16, 2021) (finding that although § 1326 had a disproportionate impact on Latinx people, the "disparity is explainable on grounds other than race" and did not therefore give rise to an inference of discrimination).  See also Feeney, 442 U.S. at 279 (stating that discriminatory intent requires more than just a showing that legislators understood the disparate impact of a law; rather the legislators must have acted "because of" the law's "adverse effects upon an identifiable group.").

In the context of the crack cocaine sentencing regime, which admittedly had a disparate impact on African Americans, litigants asserting Equal Protection challenges were required to show not just that Congress was aware of the disparate impact, but that Congress acted *because of* the disparate impact.  Clary, 34 F.3d at 712 (stating that "even if a neutral law has a disproportionate impact on a racial minority, it is unconstitutional only if . . . the decisionmaker, in this case [Congress], selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group.") (quoting Feeney, 442 U.S. at 279).

For purposes of providing a complete record for reviewing courts, this court engages in further analysis of defendant's proffered evidence of discriminatory animus by the 1952 Congress.

### b.    The Historical Background of the Decision

Mr. Sorto-Munoz's initial motion focused almost exclusively on the assertedly racist nature of the 1929 enactment of § 1326.  Docket No. 24.

14

However, the 1929 Act was completely repealed when Congress passed a new omnibus immigration act, the Immigration and Nationality Act ("INA"),[19] in 1952.[20]  Docket No. 37 at p. 10.  The focus of this court's analysis, then, is on the 1952 Act, as directed by the district court.  Id. at pp. 14-16; see also United States v. Barcenas-Rumauldo, 53 F.4th 859, 866 (5th Cir. 2022) (holding that the court must look to the 1952 enactment of § 1326 to evaluate its constitutionality, not the 1929 enactment).[21]

In 1947, the Senate Judiciary Committee was tasked with studying the nation's immigration laws and recommending a complete overhaul of that system.[22]   The study produced a 925-page committee report in 1950.[23] Omnibus immigration legislation followed in 1952.  See Pub. L. No. 82-414.

---

[19] See Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (1952).

[20] Defendant's expert admitted § 1326 underwent substantive changes when it was reenacted in 1952.  Docket No. 47 at pp. 50-51.

[21] Interestingly, defendant's expert, Dr. Kang, notes that few prosecutions of Mexicans occurred under the predecessor to § 1326 between 1929 and 1952, with prosecutors pursuing only the most egregious reentry cases involving defendants with prior criminal records.  See S. Deborah Kang, The INS on the Line, at 58 (2017).  Dr. Kang cites the very light criminal penalties imposed by courts for violations of § 1326 and the limited budgets of federal prosecutors, especially after Depression-era budget cuts occurred.  Id. (citing W.W. Husband, Second Assistant Secretary to Attorney General, September 13, 1932, file 55639/731A, RG 85, National Archives).

[22] Docket No. 38-3 at pp. 11-13 (S. Rep. No. 81-1515, 81st Cong., 2d Sess., 1-4 (1950)).

[23] See Docket Nos. 38-3, 38-4, 38-5 & 38-6 (Entirety of S. Rep. No. 81-1515 and appendices).

The historical background of the 1952 Act reveals at least three significant issues animated the legislators: (1) anti-Communism sentiment, (2) a desire to accommodate cold war refugees, and (3) the needs of the agricultural South to ensure migrant workers were available to plant and harvest crops.[24]

McCarthyism was at its height in the years 1950-52, so much of the legislative history is concerned with making sure America's immigration laws kept Communists out of our country.[25]  Senator Pat McCarran, a co-sponsor of the bill that eventually became the 1952 Act and a "dedicated anti-Communist and Cold War warrior," "saw revision of the nation's immigration laws as a tool in the United States' urgent battle against Communism."[26]  A House Report on the 1952 Act noted the "present world conditions," and the "totalitarian ideologies hostile to the United States taking a more and more firm hold on the

---

[24] Ngai, *supra*, at 235-37.

[25] Id. at 237.  Senator Pat McCarran, who along with Representative Francis Walter sponsored the 1952 Act, "viewed immigration policy as a matter of 'internal security' " and believed that "the Communist movement in the United States [was] an alien movement."  Id.  McCarran believed America needed to "bring our immigration system into line with the realities of Communist tactics."  Id.  Debate in the Senate included discussion of the plight of anti-Communists living behind the Iron Curtain who sought to immigrate to the United States.  Docket No. 54-2 at p. 2 (98 Cong. Rec. 5169 (May 14, 1952)) (comments of Sen. Pastore arguing an anti-Communist living behind the Iron Curtain in Prague would be unable to immigrate to America because application for a visa in Prague would mean certain death, but if he escaped to Paris, the new law would prevent him from applying for a visa there).

[26] Ngai, *supra*, at 237.

minds of hundreds of millions of people," were important considerations in the passage of the 1952 Act.[27]

The second related issue was the racial quotas that had been passed in the earlier 1929 immigration laws. As America fought the Cold War with the Soviet Union, we were trying to win the hearts and minds of persons in other countries and "win them to our side."[28] As evidenced by President Truman's veto message, the racial quotas were seen as inimical to the liberties guaranteed by our constitution.[29] Moreover, the quotas put America in a bad light with regard to countries we were attempting to persuade to adopt democracy as their form of government.[30] In addition, when Communists took

_____

[27] H.R. Rep. No. 82-1365 at 1747.

[28] See Docket No. 54-2 at p. 2 (98 Cong. Rec. 5169 (May 14, 1952)) (comments of Sen. Pastore stating, "The proposed [literacy requirements] would adversely affect only our friends, those who have ties in the United States and look to us for sympathy because they are being hounded in totalitarian lands. At this time, when we are seeking to assist oppressed peoples throughout the world, I do not understand why we are asked to eliminate a provision which is founded upon a noble and wholesome humanitarian philosophy.") See also id. at p. 3 (98 Cong. Rec. 5170 (May 14, 1952)) (remarks of Sen. Humphrey that persons who have escaped from behind the Iron Curtain are the "most passionately liberty-loving people" and should be welcomed into the United States). See Ngai, supra, at 228 (stating that "[d]uring the Cold War liberals felt it even more urgent to project a democratic image of the nation to the world" through America's immigration laws).

[29] See Docket No. 54-2 at pp. 203-11 (President Truman's June 25, 1952 veto statement).

[30] Id. President Truman wrote, for example, that America had entered into NATO "with Italy, Greece, and Turkey against one of the most terrible threats mankind has ever faced. We are asking them to join with us in protecting the peace of the world. . . . But through this bill, we say to their people: You are less worthy to come to this country than Englishmen or Irishmen; . . . you Turks, you are brave defenders of the eastern flank, but you shall have a quota

over a particular country and freedom-loving citizens from that country wanted to flee to America, especially refugees from Eastern Europe, Korea, and other Asian countries, the quotas were preventing the executive branch from allowing as many of these refugees into the country as were desired.[31]

The third issue involves the historic exclusion of Western Hemisphere nations from the quota system. The countries in the Western Hemisphere included Canada, Mexico, South and Central America, and the Caribbean nations.[32] None of these countries had ever been subject to any immigration quotas prior to 1952.[33] Congress expressed three reasons for not imposing immigration quotas on these nations: (1) the United States should foster friendly relations with its closest neighbors—the Western Hemisphere countries; (2) reliance on historical quotas would have meant that no citizens from Central or South America would be given quotas for immigration because,

---

[31] Id. at pp. 203-11. The proposed legislation's preference for immigrants from Northern Europe and discrimination against immigrants from Southern and Eastern Europe was also a hot topic of debate in the Senate. See Docket No. 54-2 at pp. 4-5 (98 Cong. Rec. 5171 & 5768 (May 14 and 22, 1952)) (discussion by Senators Pastore and Case regarding immigrations of those with the "proper background," i.e., Northern European). The post-World War II refugee crisis "posed perhaps the greatest challenge for immigration policy [in the United States] after the war." Ngai, *supra*, at 234.

[32] Docket No. 38-4 at p. 117 (S. Rep. No. 81-1515 at 472).

[33] Id.

at the time the historical quotas were arrived at, those nations had no citizens in the United States; and (3) the extensive Canadian and Mexican borders made it "almost impossible to protect the land borders from illegal entries into the United States."[34] "[I]n the context of the Cold War, a secure 'backyard' was especially important."[35]

Unexpressed in the Senate Report was the fact that the agricultural states in the southern United States had historically relied on migrant labor from Mexico and other countries south of the border to plant and harvest crops in those states.[36] Imposing immigration quotas on Latin America would have been inimical to the agricultural interests in the southern United States. An open border also benefitted American business interests, which gave such businesses access to Latin America, Canada, and the Caribbean nations since immigration policy between nations tended to be reciprocal.[37] For these reasons, countries in the Western Hemisphere were never subject to immigration quotas.

However, in the years leading up to passage of the 1952 Act, illegal migration across the United States-Mexico border had increased dramatically,

---

[34] Id. (S. Rep. No. 81-1515 at 473).

[35] Ngai, *supra* at 254.

[36] Docket No. 47 at p. 54.

[37] Ngai, *supra*, at 254-55.

and there was an impetus to address this problem.[38]  Notably, there was much suspicion that some portion of the persons who entered the United States illegally across the Mexican border were actually Communists from Europe or Guatemala.[39]  As indicated previously in this opinion, Cold War imperatives permeated the debate over the 1952 law.[40]

The undocumented migrants posed a problem because American agricultural employers exploited them, paid them low wages, and they could not go to authorities to complain because of their undocumented status.  Id. at pp. 231-38; see also Docket No. 54-2 at p. 248 (Sen. Kilgore explaining that when aliens entered the country illegally, they could be "kept in a state of peonage" by their employers); id. at p. 252 (Senator Paul Douglas (D-Ill.) stating that the Mexican laborers who entered illegally depressed the wages of other farm workers and placed the undocumented migrants at the mercy of their employers, forcing them to accept low wages and "not very good working conditions" or face deportation).[41]

---

[38] Docket No. 54-2 at pp. 231-38 (Testimony of A.R. Mackey, Commissioner of Immigration and Naturalization before the Senate Appropriations Committee) (stating Border Patrol apprehended 500,000 undocumented aliens in 1950, almost exclusively crossing over the Mexican border); Id. at p. 252 (98 Cong. Rec. 797 (Feb. 5, 1952)) (noting that a New York Times investigation and the Senate Agriculture Committee estimated that more than one million aliens entered the United States illegally in 1951).

[39] Ngai, supra, at 247.

[40] Id.

[41] The exhibit filed by the government at the court's Docket No. 54-2 is a series of exhibits filed by the government in a District of Oregon case, and referenced in Docket 54-1.  A portion of the government's brief in the District of Oregon

At the same time, there were many Mexicans who immigrated legally under government-to-government contracts between Mexico and America designed to provide the agricultural south with the labor it needed to plant and harvest crops.  Id. at pp. 231-38.  The entry of persons outside legal parameters undermined the legal program for supplying workers and their wages.  Id.  The impact of illegal immigration on documented immigrants' wages was illustrated when the Border Patrol was able to effectively remove undocumented workers to the far interior of Mexico so that they could not easily reenter America—wages for farm laborers in the border areas of America saw a corresponding increase.[42]

The 1952 Congress discussed the possibility of imposing quotas on all countries, including those in the Western Hemisphere, but ultimately Congress declined to do so.  Equal quotas imposed on every country (at a rate of 20,000 per country) were not adopted by Congress until it passed the Immigration Act of 1965, and the quotas from the 1965 Act were held in abeyance as to Mexico until 1976.[43]  Ironically, the 1965 Act contributed greatly to the problem of

---

case, was incorporated by reference in the government's brief in this District of South Dakota case.  This court has prepared an index to Docket No. 54-2, which is appended to this opinion, for ease of navigating the government's exhibits.

[42]  Docket No. 54-2 at p. 237 (testimony of the Commissioner of Immigration and Naturalization, A.R. Mackey, before the Senate Appropriations Committee noting that employers in the Brownsville, Texas, area had begun paying farm workers $2 per hundredweight for picking cotton, a wage that had been "unheard of" in the Brownsville area before aggressive deportation began taking place).

[43] Docket No. 47 at p. 53.

illegal immigration from Latin America (as noted above) because the 20,000-person-limit on legal immigrants from each country was substantially lower than the levels of immigration from Latin America immediately before the passage of the 1965 Act.

The point of this discussion of the racial quota system, decried by President Truman and preserved in our country's immigration laws by the 1952 Act, is that the discussion by the 1952 Congress regarding the racial quotas has nothing to do with Latinx persons.  Mexico, and South and Central America, were not subject to these quotas before the 1952 Act and they were not subject to those quotas after the 1952 Act.

> **c.  The Specific Sequence of Events Leading Up to the Enactment of the Legislation and Whether there Were Procedural or Substantive Deviations from the Normal Sequence**

Defendant's experts agreed that the procedural and substantive history of the 1952 Act followed the typical legislating process with no departures therefrom.  Docket No. 47 at pp. 50, 91-93.  This court's own examination of the enactment of the 1952 Act demonstrates that Congress adhered to the normal course it follows in the enactment of any federal legislation.  See also Machic-Xiap, 552 F. Supp. 3d at 1076 (the evidence concerning the enactment of the 1952 Act lacked procedural or substantive irregularities).

House Report 1365 contains a detailed description of the legislative process leading up to the 1952 Act:

> Upon the conclusion of the study [by the Senate Judiciary Committee], the bill S. 3455 was introduced by Senator McCarran in the Eighty-first Congress.  It was submitted to further study by

22

experts from the Immigration and Naturalization Service, the Visa
Division of the Department of State, the Passport Division of the
Department of State, the Committees on the Judiciary of the House
and of the Senate.  The Department of Justice prepared a 522-page
detailed analysis and comment on the bill and the Department of
State set up a special committee within the Department which
performed a similar function.  In addition, a number of
nongovernmental agencies submitted analyses and suggestions.

In the Eighty-second Congress, S. 716 (by Senator
McCarran) was introduced in the Senate, and H.R. 2379 (by Mr.
Walter) and H.R. 2816 (by Mr. Celler) in the House of
Representatives.  Hearings on these three measures were held
jointly by the Subcommittees on Immigration and Naturalization of
the Judiciary Committees of the House and Senate, beginning on
March 6, and terminating on April 9, 1951.  Over 50 witnesses
were heard and numerous statements were submitted for the
record.

Following the joint hearings and in the course of numerous
conferences attended by advisers representing unofficially the
Departments of State and Justice, two modified versions of the
above-mentioned three bills were introduced—S. 2055 by Senator
McCarran and H.R. 5678 by Mr. Walter.  On January 29, 1952,
the bill S. 2550 has been reported in the Senate.

H.R. Rep. No. 82-1365, (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1678-79.

See also S. Rep. No. 82-1137, at 2-3 (1952) (setting forth the same history as of

January 29, 1952).

The Senate Judiciary Committee studied the matter of the nation's

immigration laws and produced a 925-page report.  The Senate proposed a bill,

the House proposed two bills, and a conference committee composed of

members of the House and Senate met and hammered out differences between

the three bills.  The resulting bill was passed by the House on April 25, 1952,

and by the Senate on May 22, 1952.  President Truman vetoed the bill on June

25, 1952.  The bill came back and was passed by a two-thirds majority in both

houses of Congress on June 26 and 27, 1952, and thus became law.[44]  Along the way, there was ample debate over the various versions of the bills.  See Docket No. 54-2 at pp. 1-6, 231-44, 246-58, 266, 267-72, and 276 (excerpts from the Congressional Record for both houses).  There was nothing procedurally or substantively irregular in the enactment of the 1952 Act.

### d.    The Legislative History of § 1326

Assuming Mr. Sorto-Munoz is a member of a protected racial or national origin group, Arlington Heights directs courts to consider the legislative history of § 1326.  The late Justice Scalia pointed out the sometimes fictive nature of trying to attribute a particular intent to a legislative body through examination of legislative history.  Bank One Chicago, N.A. v. Midwest Bank & Tr. Co., 516 U.S. 264, 279-80 (1996) (Scalia, J., concurring in part).  To pass a law, at least 51 out of 100 Senators must vote in favor of it, plus at least 218 out of 435 members of the House of Representatives must vote to pass the law, and then the President must sign the law into effect.  If the President vetoes the law, as President Truman did the 1952 Act, then the Senate and House must override the veto by at least a two-thirds vote.  In the case of the 1952 Act, then, 57 Senators and 278 Representatives a total of 335 legislators voted in favor of the bill.

This court must presume the good faith of the legislature.  Motivations as to why legislators vote a certain way are unending.  This court does not aim to

---

[44] The vote was 57 to 26 in the Senate with 13 Senators not voting.  The vote was 278 to 112 in the House with 40 Representatives not voting.  Thus, the vote was overwhelming in the House, but much closer in the Senate.

speculate as to their motivations and instead seeks evidence as to the legislative intent in the congressional record.  As Justice Scalia wrote, "it is a fiction of the Jack-and-the-Beanstalk proportions to assume that more than a handful of those Senators and Members of the House who voted for the final version of the [bill] . . . were, when they took those actions, aware of the" text and history and drafting evolution of the bill.  Id.

Nevertheless, the Court has referred to legislative history materials on occasion to discern legislative intent where the text of the statute is ambiguous.  Samantar v. Yousuf, 560 U.S. 305, 316 n.9 (2010) (citing Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 611-12, n.4 (1991); Wallace v. Parker, 31 U.S. 680, 687-90 (1832); United States v. Fisher, 6 U.S. 358, 386 (1805)).  And Arlington Heights directs this court to examine legislative history.  Legislative history can come from committee reports, testimony before Congress, floor debates, committee hearings, and different versions of the bill before it was enacted into law.

The legislative history of Pub. L. No. 82-114, the 1952 Act, is enormous. There is a 925-page report from the Senate Judiciary Committee.  There are House Reports and Conference Committee Reports.  The Immigration and Naturalization Agency and the Department of Justice each produced commentaries on the bills constituting reports of over 500 pages each.  There are records of debates in the Congressional Record.  There are innumerable letters, reports, charts, and the like generated by Congress and by third parties.

Three Senators and four staff persons undertook an on-scene investigation of the displaced persons in Europe.  The seven traveled to Paris, Frankfurt, Stuttgart, Berlin, Munich, Berchtesgaden, Vienna, Rome, Geneva, and London, taking testimony in each city.  They visited refugee camps and centers and took testimony there.

Field investigations were also conducted within the United States on the West Coast, the Mexican border, New Orleans, Miami, Habana, New York, and the Canadian border, with stops throughout the Midwest.  Statements from some 300 to 400 persons were collected on these domestic stops.  More than 100 memoranda were submitted by field officers in the Immigration and Naturalization Service.  The Department of State, both the Passport division and Visa division, submitted many suggestions as well.

It is beyond the scope of this opinion to chronical everything in the legislative record of Pub. L. No. 82-114.  But the court attempts to address the most salient matters in that compendium.

### i.     Carry-Over Legislators

Defendant argues that the discriminatory animus behind the 1929 law infects the 1952 Act because there were 30 legislators in Congress when the 1929 law was passed who were still in Congress when the 1952 Act was passed.  Docket No. 47 at p. 39.  But 30 out of 535 is nowhere near a significant proportion of legislators.  Moreover, defendant makes no specific showing as to these 30 carry-over legislators.  Did they vote in favor of or against the 1929 Act?  Did they make risible statements in Congress in favor of

either the 1929 Act or the 1952 Act? Did they make public comments in favor of either act? What states did they represent? How did they vote on the 1952 Act? The mere fact that 30 legislators voted on both the 1929 and the 1952 Act, without more, is not probative of whether Congress acted with a discriminatory intent in passing the 1952 Act.[45]

Defendant's arguments focusing on the legislative history of the 1952 Act concentrates on four subjects: (1) a separate proposal derogatorily termed "the Wetback Bill"[46]; (2) President Harry S. Truman's veto of the 1952 Act; (3) other provisions in the 1952 Act; and (4) statements by non-Legislators.

### ii.    The "Wetback Bill"

One of the problems with trying to stem the tide of illegal entry into the United States was there was little legal disincentive for those who brought noncitizens into the country, who harbored them once they arrived, or who employed them. Docket No. 54-2 at pp. 213-44. Congress had passed a law making it a crime to bring a noncitizen into the country unlawfully or to harbor or conceal a noncitizen once they were here, but the Supreme Court had decided that no penalty attached for harboring or concealing because the statute was defectively drafted. United States v. Evans, 333 U.S. 483, 495

---

[45] In fact, some or all of the 30 carry-over legislators may have refrained from voting on one or both acts. When the vote was held to overturn President Truman's veto, 13 Senators did not vote and 40 Representatives did not vote.
[46] The question was posed during Senate Appropriations Committee hearings as to why the term "wetback" was used. Docket No. 54-2 at p. 234. The response was "They come into the country illegally, Senator, and swim the Rio Grande. It seems they get employment before they get dry, so they are called wetbacks." Id.

(1948). The "Wetback Bill" was designed to rectify this situation. The proper name of the statute was, "An Act to Assist in Preventing Aliens from Entering or Remaining in the United States" and was codified at 8 U.S.C. § 1324(a); 98 Cong. Rec. 791 (Feb. 5, 1952).

The bill was unanimously reported out of the Senate Judiciary Committee with no objections.[47] The bill was considered noncontroversial.[48] Furthermore, the bill was a temporary measure, to be permanently replaced by the provisions of the 1952 omnibus act when that omnibus legislation was enacted.[49] The bill was passed on an emergency, temporary basis to enable Mexico and the United States to finalize their agreement for migrant labor, which imposed a deadline of February 11, 1952, on Congressional action.[50] Thus, the bill was *not* part of the omnibus 1952 Act which produced § 1326. It was an entirely separate piece of legislation.

---

[47] Docket No. 54-2 at p. 246 (98 S. Cong. Rec. 791 (Feb. 5, 1952)).

[48] Id. at p. 247 (98 S. Cong. Rec. 792 (Feb. 5, 1952)).

[49] Id. at p. 248 (98 S. Cong. Rec. 793 (Feb. 5, 1952)).

[50] Id. at pp. 246-48, 256 (98 S. Cong. Rec. 791-93, 1346 (Feb. 5 & 25, 1952)). The United States and Mexico had entered into a migrant worker agreement six months prior, but limited their contract to a six-month duration in the hopes that an impending deadline would impel Congress to enact legislation dealing with the problem of the undocumented migrant. Id. at p. 250-51 (98 Cong. Rec. 795-96 (Feb. 5, 1952)). As Senator Harley Kilgore (D-WVa) explained, Mexico was trying to build up its own agriculture in northern Mexico, so the problem of undocumented migrants crossing the border to work in the United States deprived Mexico of its own needed agricultural workers. Id. at p. 250 (98 Cong. Rec. 795).

The most serious objection to the bill was that it was not extensive enough in dealing with the problem of illegal immigration.  Id.  Senators Humphrey, Lehman, and Dennis Chavez in particular, agreed that the statute was long overdue and therefore must be passed, but they decried the lack of any penalty against employers who knowingly employed undocumented migrant workers.  Id. at 248-50.  Senator Paul Douglas offered an amendment to the bill which would have criminalized the employment of undocumented migrants, but the amendment was voted down, so the bill passed as originally submitted.  Id. at pp. 253-55.

Those Senators who spoke against criminalizing employment of undocumented workers argued that it was too easy for an employer to innocently employ someone who was in the country illegally.  A Senator from California noted that some American citizens in his state spoke Spanish while many Mexican immigrants spoke English.  In addition, there was no uniform document that identified a potential employee as someone who was here lawfully or not.  See generally Docket No. 54-2 at pp. 246-55.

The desire to strike at illegal entry into the United States was based on two impulses: (1) the desire to shield the undocumented worker from exploitation and abuses by employers and (2) the desire to protect and promote decent wages for documented workers.  Id. at pp. 231-38; see also Docket No. 54-2 at p. 248 (Sen. Kilgore explaining that when aliens entered the country illegally, they could be "kept in a state of peonage" by their employers); id. at p. 252 (Senator Paul Douglas (D-Ill.) stating that the Mexican laborers who

entered illegally depressed the wages of other farm workers, and placed the

undocumented migrants at the mercy of their employers, forcing them to

accept low wages and "not very good working conditions" or face deportation);

id. at p. 237 (noting that employers in the Brownsville, Texas, area had begun

paying farm workers $2 per hundredweight for picking cotton, a wage that had

been "unheard of" in the Brownsville area before aggressive deportation of

undocumented workers began taking place).

In this vein, Representative Emanuel Celler (D-NY) stated of the bill:

This bill is not intended to get after those who desire to abide by
the law.  It seeks to get after those who are endeavoring to entice
innocent, harmless Mexicans over the border to harbor, to conceal
them, and to exploit them.  You must remember that a wetback,
because of his illegal presence, is exploitable.  We want to get after
those who are exploiting the wetback.  A wetback is like a stray
dog.  He tries to be agreeable, he will accept much ill treatment, at
least up to the point where he slinks away and tries his luck
elsewhere.  He is often overcharged for what he buys and
underpaid for his work and is always in fear of being deported.
[Middle men buy and sell illegal migrants until they reach the
farms of their employers.] . . . Those are the malefactors we want to
get after.  We want to punish those who exploit and oppress these
illegals.

The so-called illegal is under jeopardy of immediate deportation if
caught.  He is usually a hungry individual.  His need of food and
clothing is pressing.  He is a fugitive.  He cannot protect no matter
how unjustly he is treated.  The law operates against him not for
him.  There are those who capitalize on this misfortune of the
illegal.  It is these offenders that we want to get after.

Docket No. 54-2 at pp. 256-57 (98 H. Cong. Rec. 1346-47 (Feb. 25, 1952)).

Defendant focuses on the "stray dog" part of Rep. Celler's statement to

impute a racist intent to the 1952 Congress.  While the way in which

Rep. Celler made his statements was racially charged and offensive, his intent

was "to punish those who exploit and oppress these illegals," not to expel noncitizens based on a racial animus. Docket No. 44 at p. 5, third column.

In her affidavit, Dr. Kang asserts other members of Congress while debating the anti-harboring bill referred to Mexicans as a "distinct menace," "stinking cesspools," and incapable of thinking beyond their subsistence needs. Docket No. 38-1 at pp. 14-15.[51] But examination of those statements in context reveal that they are not what Dr. Kang represents them to be—statements of anti-Mexican sentiment.

The "distinct menace" phrase came from remarks by Representative John Lyle (D-Tex.) in debates on the anti-harboring bill. Reading the entirety of Rep. Lyle's statements, it is clear he was concerned about the Congress' misunderstanding of the reasons that propelled Mexicans to cross our border, legally or illegally. He argued that Congress did not understand that Mexicans crossed into the United States as a matter of "survival"—that they were "not so interested in [their] civil rights as in the contents of [their] cook pot." Docket No. 44 at p. 1, middle column, bottom of page. Rep. Lyle stated, "[t]he Mexican national comes to this country seeking work and food. He does not seek wealth or an increase in his standard of living. He seeks, rather, the means of maintaining his own standard of living." Id. third column, mid-page.

---

[51] Citations to page numbers of Dr. Kang's affidavit in this opinion are citations to the page numbers affixed to the document by CM/ECF, this court's electronic docketing system. Because the affidavit was filed with a cover sheet, the page numbers affixed by CM/ECF are off by one as compared to the page numbers Dr. Kang herself placed on her affidavit at the bottom of each page.

When Mexicans faced an imperative simply to survive, Rep. Lyle argued it would take more "than a little black ink on white paper" to end illegal immigration. Id. middle column, mid-page. In describing the Mexican national's drive to cross our border simply to gain the means of survival, Rep. Lyle stated that such Mexicans "pose a distinct menace to the property and stock of these ranchers. Either the rancher must provide for them . . . or they will help themselves, slaughtering his cattle. . . . It is not a matter of harboring them." Docket No. 44 at p. 2, first column, top of page. Rep. Lyle's statements read as a whole, while racially charged, express empathy for Mexicans who cross into the United States as a matter of life and death survival.

The "stinking cesspools" comment isolated by Dr. Kang came from remarks by Representative John Francis Shelley (D-Cal.) in debate on the anti-harboring bill. These comments by Representative Shelley, when read in context, likewise express empathy for the plight of undocumented migrants and expressed the desire to include employers in the anti-harboring bill as a necessary component to border protection. Docket No. 44 at p. 3, third column (stating that the bill could not "begin to clean up the stinking cesspools of human misery which we are now tolerating within our borders" because it did not include penalties for employers, who "willful[ly] desire[d] to create this miserable peonage."). Thus, Rep. Shelley did not call Mexicans "stinking cesspools." Rather, Rep. Shelley used that phrase to refer to the disgraceful state of the treatment of undocumented migrants within our borders, including

the "traffic in human flesh" which he termed "the source of [our] shameful condition." Id.

Dr. Kang also quotes Representative Thomas Jenkins (R & D-Ohio)[52] as stating that the United States would have imposed a quota on Mexican immigration but for the fact we did not want to impose a quota on Canada. Docket No. 38-1 at p. 15. What Dr. Kang leaves out is that Rep. Jenkins stated that Mexican immigrants had ***not*** posed problems in terms of criminality or serious criminality. Docket No. 44 at p. 6, third column, mid-page. Rep. Jenkins also stated that immigrants from Mexico made great citizens, who have "been absorbed into our body politic" and "lost themselves into our citizenship." Id.

The legislative history of the anti-harboring bill also reveals that the concern was not solely with Latinx persons in the southwest entering the country illegally. In the House debate, it was discussed that an investigation along the Atlantic seaboard reported that there were over 200,000 undocumented migrants along that seaboard. Docket No. 54-2 at p. 256 (98 H. Cong. Rec. 1346 (Feb. 25, 1952)). Defendant's expert Dr. Gonzalez O'Brien acknowledges that Congress also found the number of undocumented European immigrants entering the United States-Canada border to be

---

[52] Rep. Jenkins was elected to the House as a Republican in 1925 and 1927, but as a Democrat from 1931 through 1958. See Govtrack, https://www.govtrack.us/congress/members/thomas_jenkins/405990, (last visited December 28, 2022).

"distressing."[53]  It was expressed that it was impossible to do anything about noncitizens entering the United States illegally without prosecuting "the real criminals"—those who imported or harbored undocumented migrants.  Id.

Defendant's objection to the use of the word "wetback" is understandable.  It is an unacceptable racial epithet, a slur which the court finds offensive.  But,  defendant's experts agree that the term was not used in conjunction with § 1326 at all.  Docket No. 47 at p. 48. Defendant's expert Dr. Gonzalez O'Brien admitted that the term was in common usage in Congress in the 1940s and 1950s.  Docket No. 47 at p. 43. Courts used the term in written legal opinions throughout the decade of the 1950s and into the 1960s without any apparent derogatory intention.  See, e.g., Amaya v. United States, 247 F.2d 947, 947-48 (9th Cir. 1957); Johnson v. Kirkland, 290 F.2d 440, 441 (5th Cir. 1961).

Articles in learned journals used the word—again, without any apparent negative implication.  See George Cochran Doub & Lionel Kestenbaum, Federal Magistrates for the Trial of Petty Offenses:  Need and Constitutionality, 107 U. Penn. L. Rev. 443, 445 (1959) (citing the number of "wetbacks" charged with petty offenses under the immigration laws); Recasting our Deportation Law: Proposals for Reform, Note, 56 Columbia L. Rev. 309, 311 (1956) (reciting the number of "wetback" expelled from the United States without formal

---

[53] Docket No. 24-15 at p. 25 (Declaration at p. 24) (citing 97 H. Cong. Rec. 7155 (June 26, 1951).

proceedings in 1954); Wetbacks:  Can the States Act to Curb Illegal Entry?,
Note, 6 Stanford L. Rev. 287 (1954).

It is clear from the legislative record that the term was used specifically
to refer to Mexicans who entered the United States illegally by crossing the Rio
Grande River.  Docket No. 54-2 at p. 234 (in response to the question what the
term "wetback" referred to, it was stated: "They come into the country illegally,
Senator, and swim the Rio Grande.  It seems they get employment before they
get dry, so they are called wetbacks.").  Dr. Kang agreed this was the "most
direct" and specific meaning of the word.  Docket No. 47 at p. 83.

There is other terminology used by the 1952 Congress that we would find
unacceptable judged by present day standards.  For example, the Acting
Surgeon General of the United States recommended to Congress in a written
letter that noncitizens who are "idiots, imbeciles, or morons" or "feeble-minded"
not be admitted to the United States.[54]  In analyzing the bill, a House Report
objected to the use of the term "feeble-minded" because it was too generic a
term, but readily adopted the use of the words "idiots, imbeciles, or morons."[55]
Portions of the Senate Judiciary Committee report talk about whether
"paupers, professional beggars, and vagrants" should be excluded.[56]  None of

---

[54] H.R. Rep. No. 82-1365 at 1699.

[55] Id. at 1700.

[56] Docket No. 38-4 at p. 53 (S. Rep. No. 81-1515 at 345).

this terminology is acceptable to modern sensibilities, but there is little evidence it was distasteful or derogatory in 1952.[57]

The court joins defendant in condemning the use of the word "wetback." But defendant has failed to identify any part of the legislative history where the offensive word was ever used in connection with § 1326.

### iii.    President Truman's Veto

Although President Truman acknowledged that the 1952 Act contained many salutary provisions, he vetoed the bill because it continued "practically without change, the national origins quota system, which was enacted into law in 1924, and put into effect in 1929."  Docket No. 54-2 at pp. 203-04. President Truman decried the national origins quotas as handicapping the United States' foreign relations, designed as it was to "cut down and virtually eliminate immigration to this country from southern and eastern Europe."  Id. at p. 205.  President Truman denounced the theory behind this policy: "that people of West European origin made better citizens than Rumanians or Yugoslavs or Ukrainians or Hungarians or Balts or Austrians."  Id. at p. 206. These ideas were, the president stated, "utterly unworthy of our traditions and our ideals.  It violates the great political doctrine of the Declaration of Independence that 'all men are created equal.'  It denies the humanitarian

---

[57] Defendant's expert Dr. Kang testified an exchange that took place in 1953 shows that members of Congress would have understood the word to be derogatory in 1952.  However, the statement referred to by Dr. Kang was *not* made by a member of Congress, but rather by a lobbyist named Anson.  See Docket No. 38-1 at p. 9 (citing Extension of the Mexican Farm Labor Program, Hearings before the Committee on Agriculture and Forestry, United States Senate on S. 1207, 83rd Cong., 1st Sess., March 23, 24, 1953, 47).

creed inscribed beneath the Statue of Liberty. . . [i]t repudiates our basic religious concepts, our belief in the brotherhood of man." Id.

As discussed elsewhere in this opinion, the quota system never applied to Western Hemisphere countries, including Latin America, either in the 1929 legislation or in the 1952 Act. These statements by President Truman, then, have nothing to do with Latin America or § 1326. The national origins quota system was a completely separate part of the 1952 Act. President Truman's remarks in vetoing the 1952 legislation did not touch on § 1326.

The court also states the obvious: President Truman was not a legislator. Therefore, any statements he may have made about the 1952 Act are not statements by a legislator. Those statements cannot, then, be evidence of *Congressional* racial animus.

Secondly, to the extent President Truman condemned the 1952 Act as racist and inimical to America's ideals of democracy, that condemnation was limited to the system of national origin quotas perpetuated in the 1952 Act. Those statements had nothing to do with § 1326. The court finds no evidence of Congressional racial animus toward Latinx persons in the comments of President Truman in vetoing the 1952 legislation.

### iv.    Other Provisions in the 1952 Act

The law dictates that the court focus its factfinding in searching out evidence of discrimination on § 1326 alone as that is the statute Mr. Sorto-Munoz is challenging. But Mr. Sorto-Munoz's attack is wide-ranging and attempts to make relevant statements by legislators on other statutes like the

37

anti-harboring statute and statements by non-legislators such as President Truman and Deputy AG Ford.

The omnibus act that was the 1952 Act was a "long and complex piece of legislation" comprised of 164 separate sections, some with more than 40 subsections.  Docket No. 54-2 at p. 203 (President Truman's veto message on the 1952 Act, U.S. Congressional Serial Set (1952) pp. 1-102).  Section 1326 was but one part of that extensive piece of legislation.  The court restricts its search for racial animus to evidence pertaining to § 1326.  However, to the extent a search for evidence of racial animus could be expanded to other parts of the omnibus 1952 law, the court notes the following.

The 1952 law, for the first time, provided for notice, representation by counsel, and the right of cross-examination to noncitizens in deportation hearings.  See 82 Pub. L. No. 414 § 242(b).  It broadened the grounds for suspending deportation hearings for certain noncitizens if they had a long-term residence and immediate family in the United States.  Id. at § 244.  The 1952 Act removed the bar to Asian immigration and citizenship.  Docket No. 54-2 at p. 204 (President Truman's veto message on the 1952 Act, U.S. Congressional Serial Set (1952) at p. 5).  And it provided for judicial review of both exclusion and deportation proceedings.[58]

Defendant's expert cites to page 455 of the 925-page Senate Report as a source of Congressional racial animus toward Latinx persons.  Docket No. 47

---

[58] Pub. L. No. 82-414, § 242.

at pp. 28-29 (testimony of Benjamin Gonzalez O'Brien).  The portion of the report read as follows:

> Without giving credence to any theory of Nordic superiority, the subcommittee believes that the adoption of the national origins formula was a rational and logical method of numerically restricting immigration in such a manner as to best preserve the sociological and cultural balance in the population of the United States.

Docket No. 38-4 at p. 108 (S. Rep. No. 81-1515 at 455).

Dr. Gonzalez O'Brien characterized this passage as "a bit of a two-step" in which the authors of the report worked to maintain the national origins quota system from the 1929 law, but to disassociate those quotas from the theory of Nordic superiority, "which obviously carr[ied] a different set of connotations in the post-World War II period" after the Holocaust.  Docket No. 47 at p. 28.

The court rejects this passage as evidence of anti-Latinx animus with regard to § 1326.  First, the passage had to do with the national origins quota system, **not** with § 1326.  Second, the national quota system *had nothing to do with Latinx individuals.*  The quota system never applied to Western Hemisphere nations like Latin America, either in 1952 or at any earlier time.[59]

Dr. Gonzalez O'Brien and Dr. Kang also cited to page 473 of the Senate Report as evidence of Latinx discrimination.  That portion of the report discusses the historic nonquota status of Western Hemisphere nations and

---

[59] See also Docket No. 38-1 at pp. 30-31 (Dr. Kang's discussion of comments made by law makers with regard to the national origins quotas).

considers the possibility of imposing quotas for the first time on those nations.

The portion quoted by defendants' experts stated:

> It has been contended that many of the natives of those countries [in the Western Hemisphere] are of stock similar to the stock of natives of southern Europe and should, therefore, be subject to numerical restrictions similar to those on natives of southern and eastern Europe.  It was stated that as a result of the nonquota policy for natives of Western Hemisphere countries, an increasing number of aliens are entering from Mexico and Central America who live barely above, or even below, the subsistence level and who are content to live on their earnings during summer months and public relief the rest of the year, since their standard of living on charity is higher than it was [in their native countries].  It was also stated that these aliens have shown little capacity for self-government, have seldom applied for citizenship, and generally cannot be depended upon to support wholeheartedly our democratic institutions.  As a matter of self-protection, it was argued, these aliens should be placed under some numerical restriction.

Docket No. 38-4 at p. 117 (S. Rep. No. 81-1515 at 473).

It is not clear that the above passage reflects the voice of Congress or a member of Congress.  The report writes, "it has been contended" which raises the question:  *who* so contended?  As noted in the section of this opinion describing the sequence of events leading up to passage of the 1952 Act, Congress conducted a wide-ranging investigation and took evidence from all over the country and the world, from private citizens and from governmental agencies.  H.R. Rep. No. 82-1365 at 1678-79.  These stereotypical allegations about the natures of persons from Mexico and Central America set forth in the Senate Report may have been expressed to Congress by third persons outside of Congress.  In such an event, the statements would not reflect racial animus toward Latinx persons by legislators themselves.

40

Moreover, again, the statements are made regarding the national origins quota system, not regarding § 1326. Therefore, the statements do not reflect discriminatory animus as to § 1326. Finally, to the extent the comments cited by defendants' experts were made by a member of Congress, as is shown by the earlier discussion of Rep. Jenkins' statements, there were members of Congress who held the contrary view, that Mexicans made great citizens of the United States. Docket No. 44 at p. 6, third column, mid-page.

Defendant's expert Dr. Kang relied on a portion of the 1952 Act dealing with suspension of deportation to buttress her allegation that § 1326 was undergird with discriminatory intent. Docket No. 38-1 at pp. 20-22. Again, the comments identified by Dr. Kang have nothing to do with § 1326. In addition, the comments relied upon in large part are from non-legislators who merely gave testimony to the Senate Judiciary Committee. Id. This does not show that § 1326 was enacted with a discriminatory anti-Latinx intent.

Defense counsel elicited testimony from Dr. Gonzalez O'Brien that there was evidence at page 655 of the Senate Report indicating that Congress decided to just reenact § 1326 as formulated in the 1929 law. Docket No. 47 at pp. 32-33. But the legislative record belies this assertion. Section 1326 did not continue in a straight line from 1929 to 1952. Several changes were made in 1952, as conceded by Dr. Gonzalez O'Brien. Docket No. 47 at pp. 50-52.

Firstly, the 1952 Act added the language "found in" the United States to obviate the problem of venue. Docket No. 47 at pp. 50-51, 93. Under the 1929 law, venue for prosecuting an illegal reentry had to occur at the point along

41

America's border where the noncitizen entered. This posed logistical problems—overloading courts at ports of entry and along borders—and also created a problem for the prosecution in that the location of reentry might not be known or ascertainable.

Also, the 1952 Act consolidated a number of previous reentry criminal statutes. Under the 1929 Act, there was a separate statute for prosecuting a defendant who reentered after having previously been deported because they engaged in prostitution or other immoral acts.[60] Other similarly-narrow reentry statutes existed, such as reentry after having been expelled due to anarchism.[61] These were all consolidated into § 1326 under which a defendant who was previously deported for *any* reason and reentered the country illegally could be prosecuted.[62]

A third change reduced the penalty for a first-time offense of entering the country illegally. President Franklin Delano Roosevelt's Labor Secretary, Frances Perkins, had organized an Ellis Island committee in 1933 which recommended that Congress reduce or eliminate the penalty for first-time offenders entering the United States illegally. Docket No. 47 at pp. 105-06. Congress adopted that recommendation in 1952, reducing the penalty for a

---

[60] Docket No. 38-5 at p. 62 (S. Rep. No. 81-1515 at 655); Docket No. 47 at p. 92.

[61] Docket No. 38-1 at p. 27.

[62] Docket No. 38-5 at p. 62 (S. Rep. No. 81-1515 at 655).

first-time offense under § 1325 from a maximum penalty of one year in prison to a maximum penalty of six months' imprisonment.[63]  Id.

The Report noted that different areas of the country (seaports vs. border areas, for example) experienced their own unique problems in prosecuting immigration crimes and getting convictions.[64]  The Report stated that the criminal statutes with regard to immigration must be enacted so that they are generally applicable to every locale.[65]  Thus, contrary to any suggestion that § 1326 was focused unfairly on Latix persons, Congress seems to have gone out of its way to make sure it was a generally-applicable law that would work in all areas of the country in all different situations with whatever defendants were involved.

### v.    Statements by Non-Legislators

One of the very few persons to comment directly upon § 1326 in the legislative record was Deputy Attorney General Payton Ford, a non-legislator, who submitted a May 14, 1951, letter to the Judiciary Committee as part of the

---

[63] Defendant's expert, Dr. Kang, attempts to characterize the law's reduction of penalty as a net loss for defendants because they also correspondingly lost their right to a jury trial when first-time illegal entry was rendered a petty offense.  Docket No. 38-1 at p. 27.  The loss of a jury trial seems trifling in comparison with a halving of the potential maximum penalty, especially when defendants could still avail themselves of a court trial.  Even so, the most that can be said of the reduction in penalty from defendant's point of view is that it was a "mixed bag" of gains and losses, not an overall worsening of the law to the detriment of defendants to an extent one can conclude discriminatory motive was behind the change.

[64] Id. (S. Rep. No. 81-1515 at 654-55).

[65] Id.

committee's study on matters dealing with immigration.  <u>See</u> Docket No. 54-2 at pp. 212-23.  Deputy AG Ford was commenting on an earlier version of the bill, S. 716, 82d Cong. (2d Sess. 1952).  <u>Id.</u> at p. 212.

Defendant asserts that Deputy AG Ford suggested the new version of § 1326 include a "found in" provision allowing prosecution of noncitizens "found in the United States" after having previously been deported.  But the letter itself makes clear that S. 716, on which Ford was commenting, already included that "found in" language.  <u>Id.</u> at p. 217.

Finally, defendant points to Deputy AG Ford's use of the word "wetback." But Deputy AG Ford never used the word "wetback" in his own writing in the letter.  Rather, in commenting upon S. 716 § 287, which would have given Immigration Officers the right to enter onto farm and ranch lands to look for noncitizens, Deputy AG Ford quoted from a report of the President's Commission on Migratory Labor, Migratory Labor in American Agriculture, March 26, 1951.  <u>Id.</u> at p. 219.  The report in question stated, "[s]tatutory clarification of the above points will aid in taking action against the conveyors and receivers of the wetback."  <u>Id.</u>  In other words, the president's commission reported that action needed to be taken against those who would bring noncitizens into the country and those who would harbor, conceal, or employ them once they were here.  <u>Id.</u>

First, the court states the obvious:  Deputy AG Ford was not a legislator. He did not propose the bill nor vote upon it.  Insofar as § 1326 is concerned, he

did not affect any substantive change to the legislation, although he did suggest clarifying language.

Second, Deputy AG Ford's use of the word "wetback" was not his own usage. He was quoting from an earlier report of a presidential commission. Also, his quoting of the word "wetback" was in connection with a different section of S. 716—not the section of the bill which eventually became § 1326. Compare Docket No. 54-2 at p. 219 (commenting on S. 716 § 287), with p. 217 (commenting on S. 716 § 276).

### vi.    Summary of Legislative History Analysis

Defendant's attack on the 1952 Act is like an inverted pyramid. It is premised on the supposed racial animus of a single Senator (Pat McCarren),[66] and the report of a single Senate committee (the Senate Judiciary Committee) which that Senator chaired.[67]

Defendant has made no attempt to show that a majority of the law makers in the two legislative bodies were animated by racial animus. No evidence has been introduced regarding a racially discriminatory motive on the part of the House or on the part of the Senate as a whole. No evidence has

---

[66] Defendant relies on Sen. McCarran's supposed well-known reputation for racism and xenophobia as well as comments McCarran made in appropriations debates in 1951 and 1953. See Docket No. 38-1 at pp. 15-18; Docket No 24-15 at p. 22 (Gonzalez O'Brien declaration at p. 21).

[67] Senator McCarran did not solely chair the subcommittee which generated the report relied upon by defendant so heavily. From 1947 until 1948, Senator Chapman Revercomb (R-W. Va.) chaired the subcommittee. See Ngai, *supra*, at 236. Sen. McCarran took over chairmanship of the committee after the 1948 elections. Id.

been introduced regarding a racially discriminatory statement by any law maker *specifically with reference to § 1326.*

Defendant asks this court to impute racial animus based on a single committee report from one of those bodies, the Senate, and based on isolated comments made by a handful of legislators concerning other provisions of the law, not § 1326. Moreover, when those comments are read in context, they evidence solicitude for the plight of undocumented Mexicans in the United States.[68] Cherry-picking statements made by a handful of legislators does not represent legislative intent unless the statements reflect general agreement among the body. Brnovich v. Democratic Nat'l Comm., ___ U.S. ___, 141 S. Ct. 2321, 2350 (2021) (challenger must show "evidence that the legislature as a whole was imbued with racial motives."); Landgraf v. USI Film Products, 511 U.S. 244, 287 (1994) (Scalia, J., concurring). No such general agreement has been shown.

Defendant's experts admit that there is little to no discussion by Senators or Representatives regarding the statute defendant attacks herein: 8 U.S.C. § 1326. Docket No. 47 at pp. 37, 96, 99, 101. Discussion of § 1326 takes up only two pages of the 925-page Senate Report issued in connection with the 1952 Act. See Docket No. 38-5 at pp. 58 & 62 (S. Rep. No. 81-1515 at 646-47, 654-55). Instead, defendants' experts want to bootstrap statements made by Senators and Representatives discussing *other* provisions in the

---

[68] The court notes that fully 18 of 36 pages of Dr. Kang's affidavit concern legislative history for provisions, bills, and enactments **other than** the 1952 Act. See Docket No. 38-1 at pp. 1-18.

omnibus law that are arguably discriminatory toward Latinx peoples, and use those statements to taint the facial neutrality of § 1326. In addition, defendant's experts seek to bootstrap discriminatory statements of persons who were not legislators and use them to impugn the facial neutrality of § 1326. The court rejects that approach.

### 3.    Section 1326 Has Been Amended Multiple Times Since 1952

The government's prosecution of Mr. Sorto-Munoz was initiated in 2021, not 1952. The version of § 1326 under which he is charged is the 2021 version of that statute, not the 1952 version. Section 1326 has been amended multiple times since 1952. Defendant makes no attempt to show that the legislatures which enacted each of those amendments was also motivated by a discriminatory intent.

In 1988, Congress enacted subsection (b) of § 1326 which provided enhanced penalties for noncitizens who have committed certain prior crimes and who are found in violation of the statute. See Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471. In 1990, Congress amended the statute to increase the fines. See Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059. The same Congress again increased the penalties. See Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023.

In 1996, Congress amended § 1326 by adding subsection (d), which for the first time allowed defendants being prosecuted for illegal reentry to collaterally attack the validity of their prior removal order as a defense to the § 1326 prosecution. See Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279.

47

Mr. Sorto-Munoz makes no attempt to demonstrate racial animus of the 1988, 1990, or 1996 Congresses. Section 1326 has undergone substantive changes since 1952. He must show that the statute he is *now* being prosecuted under is unconstitutional, not the 1952 statute.

Defendant paints with a broad brush in attacking the 1952 statute, seeking to taint § 1326—which was hardly discussed at all—with asserted indicia of racism expressed by legislators in connection with other pieces of legislation and, indeed, with indicia of racism expressed by persons who were not even legislators.

The court finds this approach improper under the law—any discriminatory animus must be tied to § 1326, not merely to immigration statutes generally. But to the extent such an approach *is* proper, the court would also be required to consider all the other actions of Congress in any other area of immigration law from 1952 to 2021. Some of the more major changes in immigration law since 1952 include the following:

- in 1965 Congress enacted legislation to apply a new, equal system of quotas, granting each country 20,000 visas per year.[69]

- in 1965 Congress created a statutory ban on discrimination in immigration based on race, sex, nationality, or place of birth.[70]

- In 1986 Congress provided amnesty for some 2.7 million undocumented immigrants, a substantial number of which were Latinx persons.[71]

---

[69] Ngai, *supra*, at 227.

[70] Docket No. 47 at pp. 52-53.

[71] Ngai, *supra*, at 266.

- In 1986 Congress imposed sanctions on employers who knowingly hired undocumented workers.

- In 1990 Congress passed the Immigration Act of 1990 with the express goal of promoting diversity; it increased immigrant visas, allowed temporary protected status for individuals fleeing civil war in El Salvador, and created a new work program.[72]

These enactments by Congress since 1952 cannot be considered racially discriminatory toward Latinx persons.  To the extent defendant wishes the court to include Congressional attitudes toward all matters touching on immigration, these developments must be taken into consideration as well. The court concludes defendant has failed to carry his burden under <u>Arlington Heights</u> to demonstrate that § 1326 was motivated by a discriminatory animus toward Latinx persons.

### 4. This Court's Conclusion Follows the Vast Majority of Courts to Have Addressed this Issue

Of all the courts to have addressed an Equal Protection challenge to § 1326, all but one have found the statute to be constitutional under either the rational basis test or the <u>Arlington Heights</u> test.  The highest court to have addressed the issue is the Fifth Circuit, which applied both the rational basis test and the <u>Arlington Heights</u> test and found the statute to be constitutional under both tests.  <u>See</u> <u>Barcenas-Rumanldo</u>, 53 F.4th at 866 (discussed *supra*). Only one court has found the statute to be unconstitutional—<u>Carrillo-Lopez</u>[73]— and another court in the same district has refused to follow that decision.

---

[72] Docket No. 47 at p. 53.

[73] 555 F. Supp. 3d 996 (D. Nev. 2021).

United States v. Salas-Silva, 3:20-CR-00054-RCJ-CLB, 2022 WL 2119098, at
*1 (D. Nev. June 13, 2022).

The Salas-Silva court held that the rational basis test should apply, not
Arlington Heights, because § 1326 is an integral part of the immigration
function of Congress, which is a political function.  Id.  However, the court also
analyzed § 1326 under the Arlington Heights test and found it to be
constitutional.  Id. at *2-4.  In so doing, the Salas-Silva court rejected the
foundation underlying the decision in Carrillo-Lopez.  Id.

First, the Carrillo-Lopez court relied on Congressional silence in 1952 in
the face of the discriminatory record from the 1929 act.  Id. at *3.  The Salas-
Silva court correctly noted that the Supreme Court requires affirmative proof of
a racially discriminatory intent or purpose and begins with a presumption of
Congressional good faith.  Id. at *3 (citing Arlington Heights, 429 U.S. at 265;
and Abbott, 138 S. Ct. at 2324).  Therefore, Congressional silence in 1952 is
insufficient to create proof of discriminatory intent.  Id.

Second, the Carrillo-Lopez court relied on three pieces of evidence to
conclude Congress acted discriminatorily: (1) President Truman's veto, (2) the
letter from Deputy Attorney General Ford, and (3) the Wetback Bill.  Id.  The
Salas-Silva court rejected each of these three pieces of evidence.  Id.

As to President Truman's veto, the court noted that (a) President Truman
was not a member of Congress, (b) statements by an opponent of a bill are not
probative of the intent of those legislators who voted to enact the bill (citing

Fieger v. United States Att'y Gen., 542 F.3d 1111, 1119 (6th Cir. 2008)), and

(c) President Truman never mentioned § 1326 in his veto statement.

Regarding the letter from Deputy A.G. Ford, the Salas-Silva court noted

that Ford was also not a member of Congress and could not therefore represent

Congressional intent.  Id.

Finally, as to the Wetback Bill, the Salas-Silva court noted that only one

senator referred to this legislative enactment as the "Wetback Bill."  Id.  The

court noted that the Supreme Court has stated there must be "evidence that

the legislature as a whole was imbued with racial motives."  Id. (quoting

Brnovich, 141 S. Ct. at 2350).

Turning from the refutation of the decision in Carrillo-Lopez, the Salas-

Silva court noted that § 1326 had been amended five times since it was enacted

in 1952 and the defendant had made no showing that those subsequent

enactments were infected with discriminatory intent.  Id. at *4.  This was an

especially important omission on the defendant's part when legislative history

from the 1990 amendment reflected that Congress would always enact a law to

punish those who violate our immigration laws.  Id. at *4 n.4.  The court held a

facially neutral law can overcome its discriminatory origins through

amendment.  Id. (quoting Cotton v. Fordice, 157 F.3d 388, 391 (5th Cir. 1998)).

In addition, the court noted that the Carrillo-Lopez court had not addressed

the final inquiry under Arlington Heights:  whether § 1326 would have been

enacted even absent discriminatory intent.  Id. at *4 n.3.

51

This court joins the dozens of other courts which have rejected Equal Protection challenges to § 1326 and holds that Mr. Sorto-Munoz has failed to carry his burden to show the law under which he is charged was enacted with discriminatory intent.  See, e.g., United States v. Marco Porras, 21 CR 00158, 2022 WL 1444311, at *2 (N.D. Ill. May 6, 2022) (collecting cases); United States v. Calvillo-Diaz, 21-CR-445, 2022 WL 1607525, at * 1, 11 (N.D. Ill. May 20, 2022); United States v. Maurico-Morales, No. CR-21-298-R, 2022 WL 99996, at *1 (W.D. Okla. Jan. 10, 2022); Machic-Xiap, 552 F. Supp. 3d at 1078; United States v. Rivera-Sereno, No. 2:21-CR-129, 2021 WL 5630728, at *4 (S.D. Ohio Dec. 1, 2021); and United States v. Baldayaquez, No. 4:20-CR-83, 2021 WL 5166488, at *2 (N.D. Ohio Nov. 5, 2021).[74]

### 5.   Whether § 1326(a) Would Have Been Enacted Even Absent Discriminatory Animus

Finally, even if Mr. Sorto-Munoz had succeeded in demonstrating the 1952 Congress acted with discriminatory purpose, that is not the end of the inquiry.  The burden shifts to the government at this point to show that § 1326 would have been enacted even without any discriminatory animus.  Hunter, 471 U.S. at 228; Arlington Heights, 429 U.S. at 271 n.21 (citing Mt. Healthy City Sch. Dist. Bd. of Educ., 429 U.S. at 287).  To begin the analysis, the court examines the statutory scheme of which § 1326 is a part.

---

[74] The court notes that because Mr. Sorto-Munoz failed to show that § 1326 was enacted with discriminatory intent under Arlington Heights, he also would have failed to meet that burden under a rational basis standard of review as well because the rational basis test presents a much higher hurdle for challengers of a law to clear.

### a. Sovereignty and the Statutory Scheme in Which § 1326 is Embedded

The government first argues that its "inherent authority" as a sovereign to protect and control its borders show that § 1326 would have been enacted even without any discriminatory animus. See Docket No. 54 at 11. The defining characteristic of sovereignty is "the power to exclude from the sovereign's territory people who have no right to be there." Arizona v. United States, 567 U.S. 387, 417 (2012) (Scalia, J., dissenting) (citing 1 R. Phillimore, Commentaries Upon International Law, pt. III, ch. X, *233 (stating, "[i]t is a received maxim of International Law, that the Government of a State may prohibit the entrance of strangers into the country")). See also United States v. Flores-Montano, 541 U.S. 149, 153 (2004) (recognizing the "inherent authority" of the government as sovereign "to protect . . . its territorial integrity"); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 141 (1982) (stating that a hallmark of sovereignty is the power to exclude persons from the sovereign's land who have no right to be there); Harisiades v. Shaughnessy, 342 U.S. 580, 524 (1952) (Douglas, J., dissenting) (stating that "[t]he power of Congress to exclude . . . flows from sovereignty itself") (citing U.S. Const., art. I, § 8, cl. 4).

The number of opinions of the Court are "legion" reaffirming the principle that "the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government.' " Kleindienst v. Mandel, 408 U.S. 753, 765-66 (1972).

Defendant argues that § 1326 does not involve deportation or exclusion of anyone, so the power of the political branches to exercise the sovereign power to exclude is not implicated here. But statements of the Congress which enacted § 1326 show clearly that Congress viewed § 1326 as an outgrowth of that sovereign power. House Report 1365, discussing the 1952 Act and § 1326, begins with a strong assertion of Congress' power to control immigration:

> The power of Congress to control immigration stems from the sovereign authority of the United States as a nation and from the constitutional power of Congress to regulate commerce with foreign nations. Every sovereign nation has power, inherent in sovereignty and essential to self-preservation, to forbid entrance of foreigners within its dominions, . . . The power and authority of the United States, as an attribute of sovereignty, either to prohibit or regulate immigration of aliens are plenary . . .Congress has power to exclude any and all aliens from the United States, to prescribe the terms and conditions on which they may dome in or on which they remain after having been admitted, to establish the regulations for deporting such aliens as have entered in violation of law or who are here in violation of the law, and to commit the enforcing of such laws and regulations to executive officers.

H.R. Rep. No. 82-1365 at 1653-54. A cursory examination of Title 8 also refutes defendant's assertion that § 1326 is unconnected to the sovereign power to exclude.

Section 1326 is part of a comprehensive scheme to put teeth in the executive branch's sovereign power to exclude. Title 8 codifies the following:

- penalties for owners of transportation vessels who fail to prevent the landing of an alien at any location other than a designated port of entry,[75]

---

[75] 8 U.S.C. § 1321.

- penalties for bringing an inadmissible alien into the United States or harboring such a one once they are here,[76]

- penalties for employing aliens without authorization to be in the United States,[77]

- criminal penalties of up to five years' imprisonment for those who create false documents to satisfy the conditions of immigration laws,[78]

- penalties for aiding and assisting inadmissible aliens to enter the United States,[79] and

- importing aliens for the purpose of prostitution or any other immoral purpose.[80]

A noncitizen who enters or attempts to enter the United States illegally is subject to a class B misdemeanor with a penalty of up to six months' imprisonment. 8 U.S.C. § 1325. A noncitizen who has previously been deported, denied admission, excluded, deported or removed (because they were found in the United States illegally), and is found back in the United States is subject to a felony carrying a penalty of up to two years' imprisonment. 8 U.S.C. § 1326(a). If the noncitizen has been convicted of certain prior crimes, the penalty can be up to ten years' imprisonment (§ 1326(b)(1), (3), (4)), or up to twenty years' imprisonment (§ 1326(b)(2)).

---

[76] 8 U.S.C. §§ 1322, 1323, 1324.

[77] 8 U.S.C. § 1324a.

[78] 8 U.S.C. § 1324c.

[79] 8 U.S.C. § 1327.

[80] 8 U.S.C. § 1328.

As is evident from all these provisions, they are extensions of the sovereign power to exclude. If the United States had only the power to deport or exclude, without more, the power to exclude people from its borders would be meaningless. Indeed, immediately before the passage of the 1952 Act, there was testimony before the Senate Appropriations Committee that in 1951 500,000 noncitizens were apprehended and all Border Patrol was able to do was to "put them back across the river" at which point they would "reenter and, of course, they would be reapprehended."[81] Few prosecutions under § 1326 took place during the Depression and WWII due to financial constraints and the difficulty in pursuing prosecutions where the noncitizen crossed into the United States as the 1929 law required. Thus, Congress's determination to strengthen § 1326 by solving the venue problem showed an intent to strengthen its sovereign political power over immigration.

Based on testimony like the above, Congress determined the above-discussed provisions of Title 8, including § 1326, were necessary corollaries of the sovereign power to exclude. The 1952 Congress explicitly stated the goals of the immigration laws were directly tied to the criminal penalties: "criminal penalties are provided as an aid in the enforcement of the provisions of the [1952] bill."[82] Therefore, a holding that § 1326 is unconstitutional implicates the constitutionality of this entire scheme, not just § 1326 itself.

---

[81] Docket No. 54-2 at p. 235 (testimony of A.R. Mackey, Commissioner of Immigration and Naturalization before the Senate Appropriations Committee).

[82] H.R. Rep. No. 82-1365 at 1747. See also Docket No. 38-5 at p. 57, left side (S. Rep. No. 81-1515 at 444) (discussing immigration offenses and stating:

The implications of defendant's attack on § 1326 are vast.  In Title 8 of the United States Code, §§ 1321, 1322, 1323, 1324, 1324a, 1324b, 1324c, 1324d, 1325, 1327, 1328, and 1330—each of which is discussed above—were all originally enacted in 1952 along with § 1326.  As discussed above, there is little discussion of § 1326 in the legislative history of the 1952 Act and none by legislators.  Arguably discriminatory statements by legislators that defendant points to concern provisions other than § 1326(a).  If § 1326 is unconstitutional under a "guilt-by-association" theory, then *all of these statutes* are similarly unconstitutional under that same theory.  All of these statutes were passed by the 1952 Congress and all were part of the "general atmosphere" of alleged Latinx discrimination relied upon by defendant's experts.  This court is constrained to address the law at issue, section 1326.  This court finds defendant's approach to demonstrating Congressional discriminatory intent implicating the entire United States immigration policy is a bridge too far.[83]

---

"The exclusion and deportation statutes accomplish the basic purposes of our immigration laws to keep out of the United States aliens who should not be admitted and to deport those who enter the United States or remain here contrary to law.  In order to strengthen materially the effective administration and execution of the immigration laws, there are many provisions which involve penalties designed to aid in their enforcement.").

[83] For the reasons discussed in this section, this court would—but for the district court's contrary determination—conclude that § 1326 is an integral part of Congress' political power over immigration law and, hence, the rational basis test would more appropriately be applied here.  Nevertheless, this court is bound by the district court's decision and accordingly applies the Arlington Heights test.

### b.    Every Nation Which Enforces Its Borders Has a Corollary to § 1326

The government argues that the vast majority of nations have some corollary to America's § 1326.  To that end, the government points to a compendium of statutes concerning illegal entry in countries from around the world compiled by the Library of Congress.  See Docket No. 54-2 at pp. 171-202 (Criminalization of Illegal Entry Around the World, (Aug. 2019)).  A cursory review of that document demonstrates that nearly every country in the world has enacted some type of penal provision to punish those who enter their domains illegally.  Id.  Defendant's expert Dr. Gonzalez O'Brien agreed that most countries have legislation protecting their own borders from intrusion.[84]

In addition, the government notes that § 1326 and the immigration laws in general have undergone numerous amendments since 1952, as detailed above.  Never at any juncture of this country's history since 1929 has Congress decided that a law like § 1326 was not needed.  Section 1326 has persevered in its substance through eras of get-tough-on-crime, periods of amnesty toward noncitizens, and through our own supposedly more-enlightened time.  The fact that Congress has never, through these fluctuating cultural eras, determined to repeal § 1326 speaks volumes.

Because the United States is interested in preserving one of the core constituents of its sovereignty—exercising the power to exclude—and because a necessary corollary of that power is the power to punish those who violate the

---

[84] Docket No. 47 at p. 56.

ingress rules of this country, this court finds that Congress would have passed § 1326 even absent any discriminatory animus.

### c.      Both Sides of the Debate in 1952 Favored § 1326

Finally, the government points out that the debate over the 1952 Act pitted those Senators who favored abolishing the national quotas from the 1929 Act against those Senators who favored retaining the quotas.  See generally Docket No. 54-2 at pp. 1-6.  In the first camp were Senators Hubert Humphrey and Herbert Lehman, who proposed their own competing omnibus immigration bill, S. 2842.  See Docket No. 54-2 at pp. 7-170.  The bill proposed by Senators Humphrey and Lehman included an identical version of § 1326. Id. at p. 97 (S. 2842 p. 92).  Thus, both those legislators who wished to modernize and liberalize our nation's immigration laws and those who sought a more restrictive immigration system agreed that a measure like § 1326 was an integral part any immigration scheme.  Id. See also Docket No. 54-2 at p. 250 (Sen. Lehman stating in connection with the temporary anti-harboring bill, "I desire to . . . deport anyone who has entered this country illegally, because I think illegal entries are bad for the country" because they undermine the efforts of the "honest men and women coming into this country legally." Senator Dennis Chavez (D-NM) explicitly agreed with him.).  The court concludes the government has carried its burden to demonstrate that § 1326 would have been enacted even absent discriminatory intent on the part of Congress, should some other reviewing court find such intent existed.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying defendant's motion to dismiss the indictment in this case [Docket No. 24].

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED January 13, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge