UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. ALAN SAMUEL SORTO-MUNOZ, Defendant. | 4:21-CR-40155-01-KES ORDER DENYING MOTION TO DISMISS INDICTMENT |

Defendant, Alan Samuel Sorto-Munoz, moves to dismiss the indictment that charges him with one count of illegal reentry under 8 U.S.C. § 1326. Docket 24. Sorto-Munoz argues Congress violated the equal protection principles of the Fifth Amendment when it passed 8 U.S.C. § 1326. *See id.* The court referred Sorto-Munoz's motion to Magistrate Judge Veronica L. Duffy to hold an evidentiary hearing and to issue a Report and Recommendation. *See* Docket 37. Specifically, the court directed the parties to brief the issue of whether discriminatory intent motivated Congress in 1952 under the test articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977), when it passed the Immigration and Nationality Act of 1952. *See* Docket 37 at 15-16.

Magistrate Judge Duffy held an evidentiary hearing and issued a Report and Recommendation. *See* Docket 42; Docket 57. Magistrate Judge

1

Duffy recommends that the court deny Sorto-Munoz's motion to dismiss. *See* Docket 57 at 60. Sorto-Munoz objects to the Report and Recommendation's conclusion. *See* Docket 60. After thoroughly reviewing the Report and Recommendation, the parties' briefing and submissions, the testimony at the evidentiary hearing, and the specific legislative history and related history of the Immigration and Nationality Act of 1952 to which the parties pointed, the court issues the following order.

**I.   Discussion**

   **A. Member of Protected Class**

The court first addresses a threshold issue that the Report and Recommendation raised: whether Sorto-Munoz is a member of a protected group. *See* Docket 57 at 6-8. The Report and Recommendation noted the lack of evidence that Sorto-Munoz "is Latinx, or that he hails from Latin America." *Id.* at 8. In response, Sorto-Munoz has submitted a letter in which he states he "was born in Santa Cruz de Joyoa department de Cortes, Honduras" and that he "[is] Honduran" and "consider[s] [him]self to be Hispanic or of Latinx heritage." *See* Docket 60-1. Thus, the court finds Sorto-Munoz is a member of a protected class (Latinx) and proceeds to the merits of his equal protection challenge.

   **B. Disparate Impact**

The court previously discussed the clear disparate impact § 1326 has on Latinx individuals. *See* Docket 37 at 14. The court also recognized that

2

this impact is not dispositive under *Arlington Heights* given there were "plausible alternative explanations" for this disparity and ordered the parties to brief "whether a discriminatory purpose was a motivating factor in the 1952 enactment of § 1326, and whether, if such intent is proven, § 1326 would still have been enacted absent that impermissible motive." *See id.* at 14-15.

The Report and Recommendation recognized the disparate impact § 1326(a) has on Latinx individuals but concluded that "the disparate impact is explainable on grounds other than race or national origin discrimination." *See* Docket 57 at 13. For example, the Report and Recommendation detailed various explanations, such as the fact that Mexico shares a long land border with the United States unlike most other countries (other than Canada), and that "substantial economic incentive[s]" existed for Mexicans to immigrate to the United States due to the differences in real GDP per capita of the United States compared to Mexico. *See id.* at 9-10. The same economic differences, the Report and Recommendation explained, do not exist for Canada. *See id.* at 10-11. The Report and Recommendation also found that Congress's implementation of an annual quota of 20,000 immigrants per country in 1965, coupled with the fact that Mexican immigration had been much higher in the years leading up to 1965, helped explain the disproportionate number of deportations and in turn prosecutions under § 1326(a). *See id.* at 12-13 (citing Immigration and

Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965)). Finally, the Report and Recommendation further recounted the history of instability in Latin American countries compared to Canada, which the Report and Recommendation posited as being another race neutral explanation for the disparity in § 1326(a) prosecutions. *See id.* at 13. According to the Report and Recommendation, these "obvious explanations other than race" may have very well justified the end of the analysis of discriminatory intent. *See id.* at 13-14. Sorto-Munoz objects to the Report and Recommendation's conclusion, arguing that "[w]hile there is undoubtedly an economic disparity between citizens of Mexico and the United States, or Canada and the United States this alone cannot account for the historic disparate impact of § 1326 since its inception." *See* Docket 60 at 6.

      The Report and Recommendation improperly framed the inquiry: under *Arlington Heights*, the question is whether there is "proof that a discriminatory purpose has been a motivating factor" in a law's enactment. *See* 429 U.S. at 265-66. The Report and Recommendation instead stated that the disparate impact "is explainable on grounds other than race or national origin discrimination." Docket 57 at 13. In doing so, it appears to have relied on language from *Arlington Heights*, which stated that "[s]ometimes, a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." 429 U.S. at 266. The Report and

4

Recommendation reasoned that because the disparate impact was explainable on grounds other than race, Sorto-Munoz's challenge very well may fail from the start. *See* Docket 60 at 13-14.

But this analysis gets things backwards: *Arlington Heights* used that language when discussing the "rare" instance when a "clear pattern . . . emerges from the effect of the state action even when the governing legislation appears neutral on its face." *See id.* at 266. Only in that case does the inquiry stop—and importantly, should a court find the disparate impact analysis to be "unexplainable on grounds other than race," then the court should *sustain* an equal protection challenge. *See id.* But in most cases, such as this one, when there is not a "stark" pattern and thus disparate impact alone is not "determinative," *Arlington Heights* directs courts to "look to other evidence" to discern whether Congress acted with a "discriminatory purpose." *See id.* at 265-66. Contrary to the Report and Recommendation's approach, finding that a disparate impact is explainable on grounds other than race does *not* necessarily end the inquiry. In fact, it does the opposite: it *triggers* a closer look at the various factors and circumstances surrounding passage of the law to discern whether Congress acted with any discriminatory intent. *See id.* at 266.

The Government can successfully defend an equal protection challenge under *Arlington Heights* even if it acted with a discriminatory purpose by showing it would have made the same decision without such

5

purpose. *See* 429 U.S. at 270 n.21. But even under this approach, the Government must justify its *decision* by pointing to a nondiscriminatory purpose for passing the law. *See id.* Congress may not simply justify the *effects* of its decision based on external forces that may explain the disparate impact of its discriminatory action. *See id.*

The court rejects the Report and Recommendation's application of *Arlington Heights*. In doing so, the court sustains Sorto-Munoz's objection to the extent it objects to the Report and Recommendation's assumption that identifying potential economic and political factors that may explain the disparate impact ends the inquiry. *See* Docket 57 at 13-14; Docket 60 at 5-6. Thus, even if the Report and Recommendation correctly identifies potential alternative explanations that may explain § 1326(a)'s disparate impact on Latinx individuals, that observation says nothing about Congress's purpose in passing the law. And as *Arlington Heights* commands, the court must discern whether discriminatory intent motivated Congress when it passed § 1326. *See* 429 U.S. at 265-66.

### C. Discriminatory Purpose

Sorto-Munoz objects to the Report and Recommendation's historical analysis of the 1952 enactment of § 1326, its discussion of the "Wetback Bill," and its discussion of whether Congress as a whole was motivated in part by racial animus. *See* Docket 60 at 4. In making his equal protection challenge and arguing Congress was motivated in part by discriminatory

6

intent, Sorto-Munoz relies primarily on the following pieces of evidence: the 1929 version of the Act, the 1950 Senate Report, the use of the term "wetback" in the Senate Report and during legislative hearings, President Truman's veto of the 1952 Act, and evidence of anti-black racism in a 1955 subcommittee hearing on the District of Columbia Fire Department personnel. *See* Docket 60 at 6-12; Docket 38 at 1-11.

After reviewing the Report and Recommendation along with dozens of other Federal District Court and two Circuit Court of Appeals' decisions considering substantially the same evidence, the court joins the vast majority of courts in rejecting an equal protection challenge under *Arlington Heights* on the record raised here. *See United States v. Carrillo-Lopez*, No. 21-10233, ---F.4th---, 2023 WL 3587596, at *14 (9th Cir. May 22, 2023) (rejecting equal protection challenge); *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 865, 865 & n.15 (5th Cir. 2022) (rejecting equal protection challenge and collecting cases); *United States v. Patterson*, No. 3:11-cr-103, 2023 WL 348970, at *4 (D. Conn. Jan. 20, 2023) (same).

The court agrees with Sorto-Munoz that there is evidence that some individual senators and representatives harbored discriminatory beliefs. *See, e.g.*, S. REP. NO. 81-1515, at 573, 579-80, 584-86 (1950) (using the offensive and racist term "wetback" throughout); 98 Cong. Rec. 793 (1952) (Senator Kilgore stating that "[p]ractically every State in the Union has the wetback problem. Some of these people cannot meet the standards of

7

immigration. They may be criminals."). The court also condemns the use of the term "wetback" and finds it deeply offensive and racially derogatory.

But the court finds that the evidence submitted on the record is insufficient to show such discriminatory beliefs can be imputed onto Congress as a whole. *Cf. Carillo-Lopez*, 2023 WL 3587596, at *11 n.13 ("[I]ndividual lawmakers' name for a separate bill is not sufficient evidence to meet [defendant's] burden of showing that Congress acted with racial animus when it enacted § 1326"). Furthermore, the court agrees with the Report and Recommendation that the lack of direct statements regarding § 1326, while not dispositive, cuts against a finding of racial animus.

One federal court, the District Court for the District of Nevada, reached the opposite outcome. *See Carillo-Lopez*, 555 F. Supp. 3d 996, 1003-05 (D. Nev. 2021). But the Ninth Circuit recently overturned the district court's findings, ultimately concluding the defendant "did not meet his burden to prove that Congress enacted § 1326 because of discriminatory animus against Mexicans or other Central and South Americans." *See Carillo-Lopez*, 2023 WL 3587596, at *14. The court adopts the reasoning in the Ninth Circuit decision with respect to Sorto-Munoz's arguments.

Sorto-Munoz submits one additional piece of evidence that neither the Fifth Circuit nor the Ninth Circuit considered in rejecting an equal protection challenge to § 1326, namely evidence of anti-black racism in a 1955 House subcommittee hearing on the District of Columbia Fire

8

Department personnel. *See* Docket 60 at 12. Sorto-Munoz points out that eight members of this subcommittee were present during this hearing, seven of whom were members of Congress when Congress passed § 1326. *See id.* At this hearing, a witness who was a non-member-of-Congress repeatedly used the N-Word to refer to black firemen. *See* Fire Department Personnel: Hearings on H.R. 3753 and H.R. 3754 Before the H. Subcomm. on Police, Firemen, Sts. & Traffic of the Comm. on D.C., 84th Cong., 34-35, 37 (1955). The only member of the committee to vote Nay to the 1952 Act, Congressman Klein, asked for the witness to refer to the black individuals as "negroes" rather than using the N-word. *Id.* at 36. The Chairman of the subcommittee, Congressman Davis, who voted YAY to the 1952 Act, interrupted and stated, "we are not going to undertake to direct a witness how to pronounce words . . . ." *Id.* The transcript indicates that "APPLAUSE" followed Congressman Davis's remarks. *See id.*

      This interaction disturbs the court, but the individual who used the N-Word was not a member of Congress. And Congressman Davis's response, while deeply disappointing and offensive, is insufficient to show Congress as a whole shared his sentiment. Furthermore, the fact that "APPLAUSE" followed Davis's remarks, while notable, is insufficient because the transcript does not indicate who gave the applause. Even if the applause came from other members of the subcommittee, the court finds this specific interaction is insufficient to show Congress as a body was motivated by

racial animus in passing § 1326 because there were at most seven individuals present at this subcommittee hearing.

In summary, on the record before the court, the court finds Sorto-Munoz failed to meet his burden to show Congress was motivated in part by racial animus. Thus, the court overrules Sorto-Munoz's objections and adopts the Report and Recommendation's findings. *See Arlington Heights*, 429 U.S. at 267 (noting that a challenger's failure to meet his burden in proving racial animus "ends the constitutional inquiry").

## II.  Conclusion

For the foregoing reasons, it is

ORDERED that the Report and Recommendation (Docket 57) is adopted as modified.

It is further ORDERED that Sorto-Munoz's motion to dismiss the indictment (Docket 24) is denied.

DATED June 9, 2023

                                            BY THE COURT:

                                            */s/ Karen E. Schreier*
                                            KAREN E. SCHREIER
                                            UNITED STATES DISTRICT JUDGE